UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

STEVIE and BRENDA BARFIELD, parents
of BRIAN BARFIELD, decedent,

                                    Plaintiffs,

v.

NIAGARA FRONTIER
TRANSPORTATION AUTHORITY, *et al.*,

                                    Defendants.

**REPORT, RECOMMENDATION
AND ORDER**

21-cv-01168(JLS)(JJM)

        Plaintiffs Stevie and Brenda Barfield, acting *pro se*, seek in this action to recover for the death of their son Brian on October 29, 2020, when he was struck and killed by a subway train in the City of Buffalo. Complaint [1].[1] Before the court are the Barfields' motion for reconsideration [68] and defendants' motion for summary judgment [75], which have been referred to me by District Judge John L. Sinatra, Jr. for initial consideration [4].

        I have great sympathy for the Barfields, as the pain caused by the death of a child is unfathomable. However, "[c]ourts cannot determine a case on sympathy". American Casualty Co. v. Rose, 340 F.2d 469, 472 (10th Cir. 1964). Instead, this court "must apply the law as it is written, and follow it when it is clear". Therrien v. United Air Lines, Inc., 670 F. Supp. 1517, 1526 (D. Colo. 1987). Having reviewed the parties' submissions [68, 75, 76, 83-85, 87] and heard oral argument on June 15, 2023 [88], for the following reasons the Barfields' motion is denied, and I recommend that defendants' motion be granted.

---

[1]      Bracketed references are to CM/ECF docket entries, and page references are to CM/ECF pagination.

## BACKGROUND

On October 29, 2020 at approximately 12:20 p.m., Brian Barfield was struck and killed by a Niagara Frontier Transportation Authority ("NFTA") rail car (#103) on inbound Track 1 at the LaSalle Station operated by Quandra Parrett Ford. *See* Public Transportation Safety Board ("PTSB") Rail Accident Close-Out Report [85] at 20.  The incident was captured on video. *See* [76], manually filed DVDs.  The PTSB concluded that "the probable cause" of the accident was "the Unsafe Actions of [Brian Barfield] who intentionally jumped in front of the train as it was entering the LaSalle Station". Id. at 21. *See also* id. at 53 (report of the Medical Examiner, Carolyn Kappen, that the "manner of death" was "suicide").

The Barfields allege that Parrett Ford was "negligent because she should have had the opportunity with the use of reasonable care to slow or stop the train". Complaint [1] at 5. They further allege various theories of negligence against all defendants, including a lack of "pedestrian barriers", "police presence", "security", "ticketing personnel", "warning signs", "handicapped accommodations", and "platform edge protection". Id.

The NFTA has also counterclaimed against the Barfields for the Workers' Compensation benefits paid to Parrett Ford as a result of this incident. *See* Answer [3], ¶¶16-19. Defendants' motion only seeks summary judgment on the Barfields' claims, but they acknowledge that "[s]hould the Complaint be dismissed, the Counterclaim would also be dismissed". Defendants' Reply Memorandum of Law [87] at 9.

## DISCUSSION

**A.    The Barfields' Motion for Reconsideration**

   The Barfields move for reconsideration of my March 13, 2023 Decision and

Order [67] denying their motion for sanctions arising from the NFTA's failure to preserve

additional surveillance footage.  "[R]econsideration will generally be denied unless the moving

party can point to controlling decisions or data that the court overlooked - matters, in other

words, that might reasonably be expected to alter the conclusion reached by the court." Shrader

v. CSX Transportation, Inc., 70 F.3d 255, 257 (2d Cir. 1995).  "The major grounds justifying

reconsideration are 'an intervening change of controlling law, the availability of new evidence,

or the need to correct a clear error or prevent manifest injustice." Virgin Atlantic Airways, Ltd.

v. National Mediation Board, 956 F.2d 1245, 1255 (2d Cir. 1992).

   A motion for reconsideration may not be used to relitigate "old issues, present[ ]

. . . new theories, secur[e] rehearing on the merits, or otherwise tak[e] a second bite at the apple".

Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012).  "Such motions

must be narrowly construed and strictly applied in order to discourage litigants from making

repetitive arguments on issues that have been thoroughly considered by the court." Dingwell v.

Cossette, 2021 WL 413619, *2 (D. Conn. 2021).

   As stated in the Decision and Order, the NFTA retained all footage of Brian

Barfield on the day of the incident, including footage showing him entering the station at

approximately 12:16 p.m., waiting for the train on the platform, and jumping into the track bed

directly in front of the train. Misko Affidavit [58], ¶5. It also preserved all video of the period until

his body was ultimately removed from the scene approximately two hours later. Id.

   The Barfields continue to maintain that the NFTA was obligated to save all

surveillance videos, even those portions that did not capture Brian Barfield (see Motion for

Reconsideration [68] at 7), but they fail to point to any new case law or facts that would alter my earlier determination. Therefore, the motion is denied.

**B.      Defendants' Motion for Summary Judgment**[2]

    "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003). However, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).

    "This case arises under the laws of New York, where, in order to set forth a prima facie case of negligence, the plaintiff's evidence must establish (1) the existence of a duty on defendant's part to plaintiff; (2) a breach of this duty; and (3) that such breach was a substantial cause of the resulting injury." Gray v. Wackenhut Services, Inc., 446 F. App'x 352, 353 (2d Cir. 2011) (Summary Order). "Where a defendant establishes that a plaintiff's negligence was the sole proximate cause of an accident, the defendant is not liable to the plaintiff for damages." Id.

---

[2]      In a June 6, 2023 e-mail to my chambers, defendants' counsel noted that "the compression feature added some odd characters here and there to some of the documents" in [85-5]. See, e.g., [75-5] at 630-31, 659. Although the NFTA has not sought to amend its motion, I have not relied upon any of the documents that were altered by this compression feature.

Much of defendants' argument that Brian Barfield's own reckless conduct was the sole proximate cause of his death centers on the video evidence. *See* defendants' Memorandum of Law [75-3] at 20-26. "In certain circumstances, video evidence may be so clear and unambiguous that a court deciding a summary judgment motion may rely solely on the video, and need not afford weight to conclusory or non-credible assertions that are inconsistent with the 'blatant' video evidence." Monahan v. City of New York, 2022 WL 954463, *4 (S.D.N.Y. 2022), recon. denied, 2023 WL 2138535 (S.D.N.Y. 2023) (*citing* Scott v. Harris, 550 U.S. 372, 378-80 (2007)). Here, the surveillance video of the incident clearly depicts Brian Barfield standing alone on the station platform and then spontaneously jumping directly in front of the train, without any external inducement. *See* [76], disc no. 1 (Track #1 camera at approximately 12:20 p.m.).

However, the video alone does not establish defendants' entitlement to summary judgment, since "[a] train operator may be found negligent if he or she sees a person on the tracks from such a distance and under such other circumstances as to permit . . . her, in the exercise of reasonable care, to stop before striking the person". Soto v. New York City Transit Authority, 6 N.Y.3d 487, 493 (2006). Confirming the fact that Parrett Ford did not have sufficient time to avoid the collision, defendants offer the opinion of Michael Susi, an accredited Traffic Accident Reconstructionist, who states that Brian Barfield jumped approximately 36 to 40 feet from the train, leaving only approximately 1.06 seconds from the time of his jump until the collision and less than one second for Parrett Ford to react, in comparison to the 1.6 seconds or longer needed for the average driver to react to an emergency situation. *See* Susi Affidavit [75-5] at 768, ¶¶23, 24(l), (n), (o). Thus, "[w]hen Barfield jumped in front of the Light Rail Vehicle, the distance between Barfield and the Light Rail Vehicle made it impossible for Parrett

-5-

Ford to bring the Light Rail Vehicle to a stop before striking Barfield." Id. at 768, ¶24(m).  *See also* the Affidavit of Franklin Fowler, a Technical Trainer/Quality Assurance Manager for the Niagara Frontier Metro System, Inc., who states that that the real-time recorded data from the train indicates that it was traveling at 11.6 mph at the time the brakes were deployed, which was "in conformity with the NFT Metro's Standard Operating Procedures and within safe operating speed for entering Stations" ([75-5] at 428, ¶7), and the Affidavit of James Lavelle, the NFTA's Director or Health, Safety and Environmental Quality, who states that he found no "safety or maintenance defects with Rail Car#103". Id. at 463, ¶8.

    Regardless of whether Brian Barfield intended to harm himself, together these submissions establish that his decision to jump in the path of the train was the sole proximate cause of the accident, and satisfy defendants' burden of establishing their entitlement to summary judgment. *See* Estate of Umali v. Long Island Rail Road, 2018 WL 3861537, *3 (N.Y. Sup. Ct. 2018), aff'd, 182 AD.2d 581 (2d Dept. 2020) ("the train operator's duty to see what there is to be seen and try to stop the train certainly is not vitiated because the decedent jumped onto the tracks . . . [T]he failure of the train engineer to stop the train in time was not a substantial factor in, or proximate cause of the decedent's injuries . . . . [A]s a matter of law, the decedent's conduct was a superseding event which severed any causal connection between this tragic accident and any alleged negligence on the part of the defendant"); M.B. ex rel. Scott v. CSX Transportation, Inc., 130 F. Supp. 3d 654, 676 (N.D.N.Y. 2015) ("[d]espite seeing the train, M.B. decided to try to beat it . . . . Based upon these facts, the Court agrees that M.B.'s reckless conduct was the sole proximate cause of the accident"); Mooney v. Long Island Rail Road, 305 A.D.2d 560, 560 (2d Dep't. 2003) ("[t]he sole proximate cause of the infant plaintiffs' injuries was their reckless behavior in proceeding around a safety gate in the down position and crossing

the tracks directly behind an eastbound train without first checking to see if a westbound train was approaching"); <u>Washington Metropolitan Area Transit Authority v. Johnson</u>, 726 A.2d 172, 176 (D.C. 1999) (a "common carrier . . . owes a duty of reasonable care to its passengers. Absolving it of a duty to a person - legally a trespasser - who jumps into the path of an oncoming train to commit suicide leaves that obligation fully intact").

       None of the Barfields' arguments or submissions establish the existence of a triable issue of material fact. Much of their response focuses on Parrett Ford's alleged negligence and inadequate training. However, nothing in the record suggests that her conduct, even if negligent in some way, played any role in the accident. *See* <u>Williams v. State</u>, 308 N.Y. 548, 553 (1955) ("even where negligence and injury are both properly found, the negligent party can be liable only where the negligence charged was the proximate cause of the injury received"); <u>M.B. ex rel. Scott</u>, 130 F. Supp. 3d at 676 ("New York courts have held that '[a] plaintiff's intervening conduct . . . can break the chain of causal connection between a defendant's breach of duty and an ensuing injury to a plaintiff so as to relieve a defendant from liability for negligence. Moreover, where a party merely furnishes the occasion for an accident but does not cause it, liability may not be imposed.' . . . This has been applied in the context of railroad accidents in several cases" (citing cases)); <u>Garcia v. National Railroad Passenger Corp.</u>, 2006 WL 2990437, *3 (N.D. Ill. 2006) ("reckless behavior becomes the sole proximate cause of resulting injury, even in the face of simultaneous breaches of due care by defendants"). In any event, the Barfields' arguments are meritless.

       The Barfields speculate that Parrett Ford was under the influence of drugs or alcohol at the time of the incident, but offer nothing to support that belief. For instance, they contend that they have "never seen any blood alcohol test" (Barfields' Memorandum of Law [84]

at 7), a contention belied by the very records they rely upon. *See* [85] at 259 (Lifeloc Technologies BAC test for Parrett Ford).

They further allege that Parrett Ford's BAC test was not timely administered as required by law (Barfields' Memorandum of Law [84] at 7 (*citing* 49 C.F.R. Part 655)), which finds support in the PTSB's Rail Accident Close-Out Report's finding that "FTA [Federal Transportation Authority] alcohol testing was not administered within the two-hour FTA guideline" ([85] at 20)  Even so, this does not establish that alcohol played a role in this accident. Parrett Ford's blood alcohol concentration ("BAC") was measured to be 0.000 and although her BAC was not measured until 170 minutes after the incident, defendants' expert toxicologist William Sawyer, Ph.D. opines that a measurable BAC would remain at that time if she consumed significant alcohol prior to the incident. Sawyer Affidavit [75-5], ¶¶37(a), (e).  In other words, Dr. Sawyer opines, and the Barfields fail to dispute, that there is "no toxicological basis for challenging the scientific validity of the alcohol breath test". Id., ¶37(g).

Next, they argue that Parrett Ford was not a certified rail operator at the time of the incident. Barfields' Memorandum of Law [84] at 8. Specifically, they point to a single notation in a "Bus to Rail 20 Day Instruction" form recording 20 hours of instruction that Parrett Ford received between August to September 2020, that states "CRTFYDATE:  4/28/21". [85] at 266.  Apart from that date corresponding to Parrett Ford's birthday, it is not evident what that reference means.  Without more, it fails to overcome the documentation that Parrett Ford became certified on September 18, 2020 (*see* [85] at 264 (Annual Rail Certification), 265 (Re-Certification Record), 267 (Metro Rail Certification Card)), and nothing in the record establishes that she did not remain certified 42 days later, when the incident occurred.

Finally, pointing to the fact that Parrett Ford was involved in two previous accidents while working for the NFTA in 2019 ([85] at 250-251), had a conviction in 2007 for driving while ability impaired by alcohol (id. at 247), had her driver's license suspended in 2021 for failing to maintain insurance on her vehicle (id. at 252), and the fact that she has since been relegated to the position of ticket inspector (id. at 84), the Barfields argue that the NFTA was negligent in their training and supervision of Parrett Ford. *See* Barfields' Memorandum of Law [84] at 8-9. However, as defendants note (Reply Memorandum of Law [87] at 11), "[i]t is well settled under New York law that a claim for negligent hiring or supervision can only proceed against an employer for an employee acting *outside* the scope of his employment. Where an employee is acting within the scope of his employment, the employer's liability for his conduct is imposed by the theory of *respondeat superior*, and no recovery can be had against the employer for negligent hiring, training or retention." Perkins v. City of Rochester, 641 F. Supp. 2d 168, 174–75 (W.D.N.Y. 2009) (emphasis in original). *See also* McKnight v. City of Rochester, 2015 WL 1462379, *2 (W.D.N.Y. 2015) ("[t]he rationale for this rule is that the employer's liability for the conduct of an employee acting within the scope of his employment arises under the theory of *respondeat superior*, and recovery against the employer for negligent hiring, training or retention is unnecessary").

The Barfields' opposition also disputes the authenticity of the video relied upon by defendants that captured the incident. For instance, they contend that "[t]he video makes it 'appear' [that Brian Barfield] is an Olympic athlete", which he was not, and also "makes it 'appear' [that] he jumps in the middle directly in front of the train", which conflicts with his injuries. Barfields' Memorandum of Law [84] at 22.  These speculative claims are insufficient to raise a triable issue of fact. *See* Rutherford v. Cannon, 2010 WL 3905386, *5 n. 5 (D.S.C.),

adopted, 2010 WL 3834448 (D.S.C. 2010) ("[p]laintiff is merely speculating that the video is not authentic and conclusory allegations, without more, are insufficient to preclude the granting of summary judgment"); McIntosh v. United States, 2022 WL 1092142, *2 (N.D. Ill. 2022) ("[p]laintiff's speculation, not based on any admissible evidence, that the video recordings were altered is not sufficient to prevent summary judgment").

       The Barfields also point to some select text messages with a purported expert, Jamie Lee Seller, who states, in relevant part, that "[t]here's a lot they could do to that video" ([85] at 424), but even if this was a proper and timely disclosed expert report (which it is not), stating that this video *could* be altered is far from opining that this video *was* altered. While the Barfields also identified Edward Primeau as an audio video forensic expert, they offer no affidavit or report from him. *See* [85] at 398.

       The only expert report relied upon by the Barfields who is not challenged by defendants (*see* Reply Memorandum of Law [87] at 7-8) is from Brent Hall, M.D. of Autopsy PC, who opines in an August 30, 2022 letter that the cause of Brian Barfield's death was blunt force impact, but disagrees with the manner of death being suicide because "[w]ithout documented witnesses to the event, it is impossible to determine whether the death was suicidal or accidental". [85] at 389. As discussed above, it is irrelevant for purposes of this motion whether Brian Barfield intended to harm himself or not. The undisputed facts demonstrate that the sole proximate cause of the accident was him jumping onto the tracks without sufficient time for Parrett Ford to avoid the collision, and this is not disputed by Dr. Hall's report.

       Nor is there any support for the Barfields' argument that glass barriers or other fall protections were required. *See* Barfields' Memorandum of Law [84] at 25. In fact, Brenda Barfield testified that she was unaware of any statute or law that would require safety barriers or

-10-

barricades. Brenda Barfield deposition transcript [75-5] at 128.  Additionally, the Barfields fail to offer evidence countering Lavelle's opinion that the "LaSalle Station is and was compliant with all applicable state and federal safety regulation, including accessibility requirements mandated by the Americans with Disabilities Act". Lavelle Affidavit [75-5] at 463, ¶8.

   As defendants argue, since there was no special relationship between the NFTA and Brian Barfield, it owed him no duty to protect him from an assault by a third party, much less a duty to protect him from harming himself. *See* defendants' Memorandum of Law [75-3] at 19-20 (*citing* Weiner v. Metropolitan Transportation Authority, 55 N.Y.2d 175, 180 (1982)).  In any event, even if there was some deficiency in the fall protections or security at the LaSalle station, the sole proximate cause of the accident remains Brian Barfield's decision to jump onto the tracks. *See* Garcia, 2006 WL 2990437 at *3 (granting summary judgment to the owner and operator of a train station despite arguments that it was liable for failing "to provide various safety mechanisms at the station, including barriers", where  no "reasonable jury would conclude that [the train station owner/operator] should have foreseen that a person would attempt to outrun and then cross in front of a train that he knew was bearing down upon him").

   The Barfields also suggest that "excessive noise, vibrations and the force of the displaced air caused Brian to lose his balance, and to be struck by the train" (Brenda Barfield deposition transcript [75-5] at 137-38). This claim is refuted by Fowler, who states that "the noise, vibration and force of movement of air within the tunnel is not capable of causing a person to lose their balance or fall.  The ventilation system is engineered to control air velocity and dampen air pressures and was designed within industry standards". [75-5] at 431. Apart from speculation, the Barfields offer no evidence to support their theory or to dispute Fowler's opinion.

Although Brian Barfield's death is tragic, nothing in the record suggests that the defendants breached any duty owed to him, or that their conduct was a proximate cause of the accident. *See* Williams v. Persaud, 19 A.D.3d 686, 686 (2d Dep't. 2005) ("[t]here is nothing in the record to demonstrate that the defendant breached any duty owed to the plaintiff or, assuming such a breach, that any conduct on the part of the defendant was a proximate cause of the accident. To the contrary, the evidence established that the plaintiff's [conduct was the sole proximate cause of the accident]").

## CONCLUSION

For these reasons, the Barfields' motion for reconsideration [68] is denied, and I recommend that defendants' motion for summary judgment [75] be granted, and that both the Complaint and Counterclaim be dismissed.

Unless otherwise ordered by District Judge Sinatra, any objections to this Report, Recommendation, and Order must be filed with the clerk of this court by July 24, 2023. Any requests for extension of this deadline must be made to District Judge Sinatra. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek, 838 F. 2d at 58; Thomas v. Arn, 474 U.S. 140, 155 (1985). Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the

proposed findings and recommendations to which objection is made and the basis for each

objection . . . supported by legal authority", and must include "a written statement either

certifying that the objections do not raise new legal/factual arguments, or identifying the new

arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply

with these provisions may result in the district judge's refusal to consider the objections.

Dated: July 7, 2023

                                        JEREMIAH J. MCCARTHY
                                        United States Magistrate Judge